**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SUZANA KRAJISNIK                  ) | |
|                                      ) | |
|            **Plaintiff,**           ) | |
|                                        ) | |
| vs.                                       ) | |
|                                        ) | **No. 1:21-cv-00775** |
| C.D. PEACOCK, INC.,        ) | |
| SEYMOUR HOLTZMAN,     ) | |
|  individually, ROBERT         ) | **Trial by Jury Demanded** |
| BAUMGARDNER, individually,  ) | |
| DYOL HILL, individually,     ) | |
| CHRISTOPHER CROTEAU,    ) | |
| individually, & YINGXUE DUAN,  ) | |
| individually,                           ) | |
|                                        ) | |
|            **Defendants.**        ) | |

**COMPLAINT**

Plaintiff Suzana Krajisnik ("Krajisnik" or "Plaintiff"), by her attorneys, the Garfinkel Group, LLC, complain against Defendants C.D. Peacock, Inc. ("CDP"), Seymour Holtzman ("Holtzman"), individually, Robert Baumgardner ("Baumgardner"), individually, Dyol Hill ("Hill"), individually, Christopher Croteau (Croteau"), individually, and Yingxue Duan ("Duan"), individually, for (1) terminating her employment in retaliation for whistleblowing and refusing to engage in flagrant illegal activity that violated state and federal law, in violation of the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/1, *et seq*. ("IWA"); (2) firing her and committing common law retaliatory discharge; and (3) engaging in racketeering, in violation of the Racketeer Influenced and Corrupt Organization Act 18 U.S.C. §§ 1961 *et seq*, and in support thereof, states:

**INTRODUCTION**

1.     Three employees of CDP, Plaintiff, Olga Nelson ("Nelson"), Giuseppe Di Lorenzo ("Di Lorenzo"), herein collectively referred to as the "whistleblowers or co-whistleblowers," uncovered a Scheme of illegal activity (the "Scheme"). They discovered that the Scheme was being

1

perpetrated by a coworker and multiple management-level employees, including the CEO, and with full knowledge of CDP owner Seymour Holtzman.

2. The heart of the Scheme was a conspiracy by the Defendants to illegally sell Rolex watches to foreign grey market resellers in order to enrich themselves. In order to further the Scheme, the Defendants conspired to violate numerous federal and state laws including but not limited to racketeering, money laundering, mail, wire, immigration, and credit card fraud, and Illinois sales tax evasion.

3. Upon information and belief, they replicated the Scheme described herein with several other luxury watch and jewelry brands, including, but not limited to Patek Phillipe.

4. The Plaintiff, and the two other innocent co-whistleblowers, repeatedly notified management of the illegal and fraudulent activities while refusing to participate in the Scheme. In response, Plaintiff and the two other co-whistleblowers, respectively, were summarily fired for their knowledge, their unwillingness to be complicit in the Scheme, and their protected whistleblowing activities. In the meantime, as Plaintiff became aware of the fraudulent behavior, she suffered undue emotional stress, resulting from the pressure of coercion to participate in the scheme.

5. In addition to the numerous violations of state and federal criminal statutes, the Scheme defrauded Rolex, the international watch manufacturer, as well as other jewelry suppliers, both known and unknown.

6. Krajisnik was a newly hired employee of CDP in 2018, with no previous experience in the jewelry industry.

7. Commencing in late 2018, Plaintiff noticed another newly hired employee, who also had with no previous jewelry sales experience, Ying Duan, engaging in flagrantly illegal behavior. Duan, in concert with members of management committed an ongoing pattern of mail and wire fraud, money laundering, tax evasion, and defrauding Rolex (the "Scheme"). Duan willfully aided

CDP management and ownership in fraudulently and intentionally violating the Rolex Distribution

Agreement ("Distribution Agreement"[1]).

8.      Upon on information and belief, Duan is a Chinese national, illegally residing in the

United States, by fraudulently leveraging a student visa in concert with CDP management.

9.      As part of the Scheme, the other defendants conspired to aid and abet Duan's

fraudulent visa certifications, in order to facilitate their ongoing racketeering enterprise.

10.      The Plaintiff and the co-whistleblowers began reporting Duan's illegal activity to

CDP management beginning in 2018. Management took no corrective action.

11.      In response to the Plaintiff and her co-whistleblowers' reports, the management

team repeatedly excused Duan's illegal activity.

12.      Management then attempted to coerce Plaintiff and her co-whistleblowers to

become part of the Scheme. They repeatedly refused.

13.      As the illegal behavior accelerated in early 2019, it became clear to Plaintiff that store

management was complicit in the Scheme. Later it was discovered that the entire chain of

management was participating in the Scheme, including Holtzman.

14.      The Plaintiff escalated their complaints to higher levels of management, including

CDP's CEO, Baumgardner, and ultimately to CDP's owner, Holztman.

15.      In May of 2019, Nelson, complained directly to CDP, CEO Baumgardner about the

illegal activity of the Scheme.

---

[1] A version of the Rolex's Distribution Agreement is available on the Securities and Exchange Commission's ("SEC") website. <https://www.sec.gov/Archives/edgar/containers/fix031/817946/0003.txt >. Upon information and belief, the Distribution Agreement in question, between CDP and Rolex, is substantially similar in character and substance to the same agreement enclosed herein as Exhibit Q. Exhibit Q is a document available to the general public and obtained via a Google search from the Securities and Exchange Commission's ("SEC") website between Rolex and another retailer, and contains similar and/or the same restraints on sales of Rolex products, as discussed herein.

16. Subsequently, in June 2019, C.D. Peacock commenced firing whistleblowers, as follows:

    A. Baumgardner and Store Director Hill fired Nelson, within weeks of escalating her reporting of the Scheme, in an egregiously and deliberate violation of the IWA.

    B. As a pretext for Nelson's wrongful termination, Baumgardner and Hill deliberately misrepresented her allegations of blatantly illegal conduct by Defendants, including a comment made within one of Nelson's protected complaints.

    C. In this interim period, store manager, Hill, left CDP's employ under mysterious circumstances and was replaced by Croteau.

    D. On November 29, 2019 Krajisnik met with Croteau and reported her knowledge of the Scheme.

    E. In December 2019, just a few weeks after Krajisnik reported the full scope of her knowledge of the Scheme to Croteau, she too was fired.

    F. In December 2019, Di Lorenzo reported the full scope of his knowledge of the Scheme to Croteau.

    G. In January of 2020, Di Lorenzo was fired as well.

## JURISDICTION AND VENUE

17. This Court has jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 *et seq.*, (specifically 18 U.S.C. § 1964(c)), and 28 U.S.C. § 1331.

18. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' Illinois law claims for violation of the IWA, and common law retaliatory discharge.

19. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because Plaintiffs and all of the Defendants either reside in this district or have their principal place of business in this district, and all events giving rise to Plaintiff's claim occurred within this district.

## PARTIES

20. Plaintiff, Suzana Krajisnik, is an adult resident of Cook County, Illinois, residing within this judicial district, and a former employee of CDP.

21. At all times relevant herein, Krajisnik was a CDP employee.

22. Defendant, C.D. Peacock, is a domestic corporation, headquartered in Oakbrook, Illinois. CDP is a jeweler, that maintains retail locations at Oakbrook Center in Oakbrook, Illinois, Woodfield Mall in Schaumburg, Illinois, and Old Orchard Shopping Center in Skokie, Illinois.

23. Defendant, Seymour Holtzman, is the owner of CDP, which is headquartered Oakbrook, IL, within this judicial district.

24. At all times relevant herein, Holtzman was the owner of CDP.

25. All Defendants conspired to in the Scheme to commit a multitude of crimes, including racketeering under Holztman's aegis.

26. On information and belief, Holtzman violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' Scheme. Holtzman oversaw and enabled the Scheme which involved a multitude of crimes, including:

    A. mail fraud, violating federal statutes including but not limited to the 18 U.S.C. § 1341 and 18 U.S.C. § 1349;

    B. wire fraud, violating federal statutes including but not limited to 18 U.S.C. §1343;

    C. credit card fraud violating Illinois statutes, including but not limited to 720 Ill. Comp. Stat. 5/17-37, 39 and 40;

    D.  aiding and abetting immigration fraud, violating federal statutes including but not limited to violation of 8 U.S.C. §1324(a),

    E.  inflating in-state sales to circumvent state Illinois sales tax laws, including but not limited to 35 Ill. Comp. Stat. 120/13;

    F.  conspiracy to defraud Rolex in violation of 18 U.S.C. §371; and

    G.  money laundering, in violation of §352 of the USA Patriot Act and the corresponding regulations and guidance issued by the U.S. Financial Crimes Enforcement Network, including but not limited to 31 CFR § 1027.210.

27.    Defendant, Robert Baumgardner, is former employee of CDP, which is located in the Village of Skokie in Cook County, Illinois, within this judicial district.

28.    At all times relevant herein, Baumgardner was the C.E.O. of CDP.

29.    On information and belief, Baumgardner violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' Scheme. Baumgardner oversaw and enabled the Scheme which involved a multitude of crimes, including:

    A.  mail fraud, violating federal statutes including but not limited to the 18 U.S.C. § 1341 and 18 U.S.C. § 1349;

    B.  wire fraud, violating federal statutes including but not limited to 18 U.S.C. §1343;

    C.  credit card fraud violating Illinois statutes, including but not limited to 720 Ill. Comp. Stat. 5/17-37, 39 and 40;

    D.  aiding and abetting immigration fraud, violating federal statutes including but not limited to violation of 8 U.S.C. §1324(a),

    E.  inflating in-state sales to circumvent state Illinois sales tax laws, including but not limited to 35 Ill. Comp. Stat. 120/13;

    F.  conspiracy to defraud Rolex in violation of 18 U.S.C. §371; and

G. money laundering, in violation of §352 of the USA Patriot Act and the corresponding regulations and guidance issued by the U.S. Financial Crimes Enforcement Network, including but not limited to 31 CFR § 1027.210.

30.     Defendant, Dyol Hill, is a former employee of CDP, which is located in the Village of Skokie in Cook County, Illinois, within this judicial district.

31.     At all times relevant herein, Hill was the Store Director for CDP. On information and belief, Hill violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' Scheme. Holtzman oversaw and enabled the Scheme which involved a multitude of crimes, including:

A. mail fraud, violating federal statutes including but not limited to the 18 U.S.C. § 1341 and 18 U.S.C. § 1349;

B. wire fraud, violating federal statutes including but not limited to 18 U.S.C. §1343;

C. credit card fraud violating Illinois statutes, including but not limited to 720 Ill. Comp. Stat. 5/17-37, 39 and 40;

D. aiding and abetting immigration fraud, violating federal statutes including but not limited to violation of 8 U.S.C. §1324(a),

E. inflating in-state sales to circumvent state Illinois sales tax laws, including but not limited to 35 Ill. Comp. Stat. 120/13;

F. conspiracy to defraud Rolex in violation of 18 U.S.C. §371; and

G. money laundering, in violation of §352 of the USA Patriot Act and the corresponding regulations and guidance issued by the U.S. Financial Crimes Enforcement Network, including but not limited to 31 CFR § 1027.210.

32.     Defendant, Christopher Croteau, is an employee of CDP, which is located in the Village of Skokie in Cook County, Illinois, within this judicial district.

7

33. At all times relevant herein, Croteau was the Store Director for CDP. On information and belief, Croteau violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' Scheme. Holtzman oversaw and enabled the Scheme which involved a multitude of crimes, including:

A. mail fraud, violating federal statutes including but not limited to the 18 U.S.C. § 1341 and 18 U.S.C. § 1349;

B. wire fraud, violating federal statutes including but not limited to 18 U.S.C. §1343;

C. credit card fraud violating Illinois statutes, including but not limited to 720 Ill. Comp. Stat. 5/17-37, 39 and 40;

D. aiding and abetting immigration fraud, violating federal statutes including but not limited to violation of 8 U.S.C. §1324(a),

E. inflating in-state sales to circumvent state Illinois sales tax laws, including but not limited to 35 Ill. Comp. Stat. 120/13;

F. conspiracy to defraud Rolex in violation of 18 U.S.C. §371; and

G. money laundering, in violation of §352 of the USA Patriot Act and the corresponding regulations and guidance issued by the U.S. Financial Crimes Enforcement Network, including but not limited to 31 CFR § 1027.210.

34. Defendant, Yinxue Duan, is an employee of CDP, which is located in the Village of Skokie in Cook County, Illinois, within this judicial district.

35. At all times relevant herein, Duan was an employee of CDP. On information and belief, Duan violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' Scheme. Duan participated in the Scheme which involved a multitude of crimes, including:

A. mail fraud, violating federal statutes including but not limited to the 18 U.S.C. § 1341 and 18 U.S.C. § 1349;

B. wire fraud, violating federal statutes including but not limited to 18 U.S.C. §1343;

C. credit card fraud violating Illinois statutes, including but not limited to 720 Ill. Comp. Stat. 5/17-37, 39 and 40;

D. aiding and abetting immigration fraud, violating federal statutes including but not limited to violation of 8 U.S.C. §1324(a);

E. inflating in-state sales to circumvent state Illinois sales tax laws, including but not limited to 35 Ill. Comp. Stat. 120/13;

F. conspiracy to defraud Rolex in violation of 18 U.S.C. §371; and

G. money laundering, in violation of §352 of the USA Patriot Act and the corresponding regulations and guidance issued by the U.S. Financial Crimes Enforcement Network, including but not limited to 31 CFR § 1027.210.

## FACTUAL ALLEGATIONS

36.     A majority of CDP's business comes from watch sales. CDP proudly advertises being an official seller of a variety of expensive, high-end watches, including, but not limited to Rolex. The website states:

> C.D. Peacock is proud of be part of the worldwide network of Official Rolex Jewelers, allowed to sell and maintain Rolex watches. With the necessary skills, technical know-how and special equipment, we guarantee the authenticity of each and every part of your Rolex. Browse the Rolex collection below, or simply contact us to book an appointment with our dedicated staff, who can help you make the choice that will last a lifetime.[2]

37.     As one of the world's most prestigious and exclusive watch brands, Rolex only sells to a limited number of select authorized retailers in the United States. Rolex's own website[3]

---

[2] https://cdpeacock.com/rolex-watches-chicago/
[3] https://www.rolex.com/rolex-dealers/unitedstates/illinois/chicago.html#locateme=true

provides, "ONLY OFFICIAL ROLEX RETAILERS ARE ALLOWED TO SELL AND MAINTAIN A ROLEX WATCH."[4]

### CDP's Rolex-Specific Policies

38.     Once Rolex authorizes a retailer, said retailer must enter into the Distribution Agreement. The retailer must follow strict guidelines, audited and enforced by Rolex, in order to maintain the ability to sell Rolex products.[5]

39.     Rolex utilizes a regional sales representative and "secret shoppers," shoppers sent "under cover" to ascertain whether a retailer is following Rolex's policies. The Rolex Regional Sales Representative assigned to CDP during the relevant time period was Chad Adams ("Adams"). In addition, to the best of Plaintiff's knowledge and belief, retailers are required to submit various certifications to Rolex.

40.     In order to enforce compliance with the Distribution Agreement, CDP ostensibly maintains its own set of policies to ensure its employees follow and meet provisions of its Rolex's contract. Employees are informed that the most important CDP policy is: "Sale of Rolex Products

---

[4] Exhibit Q, the publicly available version of the Distribution Agreement, provides similar restrictions on sale of Rolex products, setting forth, in relevant part:

   5. ROLEX TRADEMARKS

   5.1 USE OF ROLEX TRADEMARKS. Any promotional materials or other item bearing a Rolex trademark (such as the words "ROLEX" or "Oyster" and the Rolex Crown Emblem) furnished by Rolex remains the property of Rolex. Consent to use the Rolex trademarks is granted to Official Rolex Jewelers on a limited basis only, solely for the purpose of advertising and promoting the sale of Rolex products during the term of this Agreement. Jeweler will not acquire, nor will it claim any right, title or interest to the tradename or trademark ROLEX, nor to any associated trade dress, nor to any other trademarks, copyrights or other intellectual property owned by Rolex.

See. Ex. Q.

[5] This is a fact confirmed in the publicly available Exhibit Q, which sets forth specific guidelines for the relationship between a retailer and Rolex under which the retailer may sell Rolex products.

must be made in person at the approved location. Distance selling by catalog, phone, Internet or other means is not permitted."[6]

41.     CDP's own policies ostensibly enforce mandatory procedures to ensure that it upholds the Distribution Agreement including Rolex's strict sales and quality standards, such as the avoidance of volume sales, "grey market" resales, and the like. These include but are not limited to the following: (1) sales professionals must be wearing a Rolex timepiece and a Rolex scarf or tie while making Rolex sales; and (2) protective stickers must be removed from any watches sold in-store. With respect to this last rule, CDP's Rolex policies specifically provide that this step is required so that watches are not sold on the "grey market."[7] Id. "Failure to follow this policy is grounds for termination." Id.

### CDP's Rolex Policies Regarding Sales to Unknown Buyers

42.     CDP's Rolex policy makes clear that Rolex does not allow sales of limited availability models to unknown clients. Id. The policy provides that certain high-demand Rolex watches should **_only_** be sold to clients that the sales professional already knows, and the buyer should not have a purchase history consisting of *only limited availability* models.[8] "If [the hard-to-get models] end up on the internet, this will result in a significant problem for the company." Id.

---

[6] See excerpts from various iterations of CDP's Rolex policies, attached as Exhibit A.
[7] "Grey market" and "black market" are terms used interchangeably to refer to the market for unlawfully resold Rolex products.
[8] This policy, too, is confirmed by the publicly available Exhibit Q, which mandates:

> 3. RETAIL SALES ONLY. Jewelers will sell Rolex products only to ultimate consumers, at the retail level, in transactions that originate over the counter at its authorized location(s). All other methods of the sale (except for Rolex-approved corporate/presentation sales) are considered transshipping. Rolex is the sole distributor of Rolex watches in the United States. Rolex has not authorized any ORJ or any other person to act as a wholesaler or subdistributor; therefore, any transshipment of Rolex watches, even if unintentional, is prohibited. ORJs may not sell watches to customers referred from outside their local market area (unless the sale is transacted in person at an authorized location), nor may they pay a feel for any referrals.

43. CDP has myriad other Rolex-specific sales rules. These include but are not limited to prohibiting above-market or above-retail sales of Rolexes. The policy makes clear that there are "NO EXCEPTIONS" to this rule. Id.

44. Rolex has strict warranty requirements which are required to be enforced by CDP, through their store policies. Until the time frame discussed below, CDP required that for all Rolex sales, the store's Rolex Manager and/or Store Manager must monitor the sales. For every Rolex sale, CDP's policy required that both sides of the completed warranty card are copied, along with the sales slip in the store. This process ensures that Rolex is able to verify that the watch was not sold on the grey market but rather sold to an eligible customer at an approved Rolex retailer.

45. When customers used credit cards, CDP sales professionals were required to verify that the purchasers' identification matched the credit card.

46. These policies were enacted to ensure that the Distribution Agreement was not violated, and that CDP was not defrauding Rolex.

CDP's Rolex Policies re: Shipping & Taxes

47. In order not to violate the relevant Illinois sales and use tax statutes and regulations, the CDP policy[9] was that the shipping of watches should not be volunteered or offered unless a customer inquired. Watches could only be shipped to the same customer who bought the watch in-person. The address that the watch was being shipped to had to match the address of the buyer.[10]

48. This rule was another check on unknown and untrusted customers volume-selling Rolexes or re-selling them on the black market. This policy is a ruse to ensure that in the event of a sales tax audit by the Illinois Department of Revenue, CDP maintained plausible deniability and records to substantiate a fraudulent out of state sale.

---

[9] See Exhibit A, pg. 5.
[10] This policy is a per se violation of 35 Ill. Comp. Stat. 120/13.

49.     As part of its sales tax collection and shipping policies, CDP required, unequivocally, that watches could not be shipped to states that were not already on the approved list contained within Exhibit A.

50.     The sales tax collection policy also provided that sales taxes "must be collected at [point of sales]" for watches shipped to Indiana, Michigan, and Wisconsin.[11]

CDP Policies re Rolex Distribution

51.     In order to adhere to the Distribution Agreement and policies stated above, CDP also maintained strict control over the allocation of Rolex watches to its sales professionals (e.g. this policy would serve to restrict the sale of a limited availability watch to an inappropriate customer).

52.     Upon receipt of watches, the Rolex Manager and Store Director would take each watch into the Store Manager's office, where they would record the watch's serial numbers, the warranty numbers, and determine, based on demand and other factors, which sales professional would be assigned the watch.

53.     CDP also instituted basic sales procedures depending on the nature of the transaction. CDP's Old Orchard store had two entrances: a CDP entrance and a Rolex entrance. The general rule was that, for the customers who entered on the Rolex side, the Rolex Manager would make contact with the customer and attempt to make a sale. For customers who entered on the CDP side, the customer was assigned to whichever sales professional's turn it was for a customer to be assigned.

54.     Prior to the time period described herein, newly hired sales professionals were not allowed into the Rolex room and/or to sell Rolex products until they had an established client base and had been trained specifically on Rolex, its products, and its sales policies

The Scheme is Set in Motion

---

[11] See Exhibit A, pg. 20.

55.     Until approximately late November or December 2018, the CDP Rolex policies mentioned above remained in effect and were strictly enforced.

56.     Two events catalyzed the Scheme. The first was Duan's hiring.

57.     The second occurred in either December 2018 or January 2019. At that time, CDP staff were informed that a certain $10 million sales goal had been set.

58.     CDP sales professionals were told that if they hit $10 million in sales, Rolex would help pay for a remodel of the CDP Old Orchard store, and that certain executives, namely Hill and Baumgardner, stood to make substantial bonuses. Lastly, they were informed that if they attained the goal, Rolex would make additional high-demand products available to CDP.

Co-Whistleblower Giuseppe "Joe" Di Lorenzo

59.     Di Lorenzo began working for CDP in October 2012 as a sales professional in the Old Orchard Store.

60.     In 2017, he was promoted to Rolex Manager of the Old Orchard store.

61.      As the store's Rolex Manager, Di Lorenzo's duties included overseeing Rolex sales. This included ensuring access to Rolex products rotated between sales professionals when new customers visited the store, monitoring Rolex sales interactions to ensure policies were followed, ensuring that Rolex warranties were properly issued, selling to customers when they entered the store from the Rolex entrance, and attempting to ensure Rolex products were not sold to "flippers."[12]

62.     When new Rolex products arrived, Di Lorenzo and Hill were responsible for meeting, recording the serial and warranty numbers for each Rolex product, and assigning them,

---

[12]  The colloquial term for grey market sellers who attempted to obtain watches for resale.

either to the sales professional who requested the watch on behalf of an existing customer or to whichever sales professional's turn it was to receive access to the watch.

63.     When Di Lorenzo was hired, and throughout his training, CDP made clear that online and grey market sales of Rolex watches were strictly prohibited.

Co-Whistleblower Olga Nelson

64.     Nelson was hired in July 2016 and was promoted to Assistant Store Manager on approximately April 2, 2017.

65.     As Assistant Manager, Nelson's duties included selling and designing custom jewelry, Rolex products, and supervising sales staff.

66.     In approximately November 2017, CDP hired Dyol Hill, a friend of Baumgardner.

67.     When Hill was hired, Nelson, Di Lorenzo, and the rest of the staff were told that Hill was being brought in to "clean up"[13] the Old Orchard Store.

Plaintiff Suzana Krajisnik

68.     Plaintiff Krajisnik was hired to work as a sales associate at CDP in approximately October 2018 and initially staffed for a 40-hour workweek.

69.     Krajisnik was hired at approximately the same time as Duan, another first-time sales professional.

70.     Neither Duan nor Krajisnik had a prior customer base or any jewelry sales experience.

---

[13] Until approximately November 2017, CDP's Old Orchard Store experienced significant turnover of its store directors. A series of store directors, Ralph Zupo, Sally Salcena, and Mariann Alkhovsky, were all hired and fired within months of one another for various policy and performance-related violations.

71.     Working under Nelson, their immediate supervisor, both Duan and Krajisnik completed CDP training: they were shown how to cold-call potential customers and taught CDP policies, including the aforementioned Rolex policies.

72.     Krajisnik initially performed adequately, when she was allowed her full hours of time and given equal opportunities to make sales.

73.     It was only when Krajisnik was denied access to Rolex products, as a result of reporting and/or refusing to partake in the illegal pattern of activity referenced herein, that she had her hours cut, and therefore was prevented from meeting the requisite sales expectations.

<u>Nelson Catches Duan Breaking Store Policies, Rolex Policies, and Several Laws</u>

74.     In approximately December 2018, Nelson observed Duan attempting to ship an empty Rolex box out of state on behalf of a in store customer purchase.

75.     Nelson stopped her from engaging in the behavior and reported it to Hill.

76.     Contrary to the training that all new sales professionals receive, Hill inexplicably defended Duan, responding that she was "new" and "did not know better."

77.     This was merely the first time she was observed by Krajisnik or her co-whistleblowers engaging in criminal and other fraudulent activity.

78.     It was around this time, in late December 2018, that Baumgardner and Hill informed Krajisnik and her co-whistleblowers of the $10 million sales goal. This announcement coincided with the acceleration of Duan's illegal activity and the overall initiation of the Scheme.

79.     The integral element of the Scheme was Duan's participation in the conspiracy to commit the aforementioned criminal activity via prohibited volume sales of Rolex watches out of the country.

<u>Di Lorenzo observes and reports Duan's likely illegal behavior</u>

80.     In approximately January or February 2019, Krajisnik and her co-whistleblowers, respectively, began observing Duan openly and flagrantly engage in activities that not only clearly violated CDP and Rolex policies, but were also criminal activities that consisted of racketeering, money laundering, mail, wire, immigration, and credit card fraud and Illinois sales tax evasion.

81.     As the Old Orchard Store Rolex Manager, Di Lorenzo was privy to Rolex sales numbers.

82.     In late January or early February 2019, typically a slow post-holiday season period for CDP, Di Lorenzo knew that customers had not been visiting the store in great numbers. Yet, despite the lack of in-store customers, Di Lorenzo discovered that the Rolex sales numbers were skyrocketing, and Duan, who had no established customer base and rarely, if ever, had in-store customers, was recording extraordinary Rolex sales.

83.     He discovered that Duan was regularly engaging in forging signatures on credit card receipts *and* making remote sales of Rolex products, whether on the phone or online, to heretofore unknown customers.

84.     Di Lorenzo uncovered that Duan was using her own credit card to complete sales transactions for sales allegedly made to customers, and either forging customer signatures and/or simply writing, "known by Ying [Duan]" in the signature line.[14] Based on information and belief these activities fraudulently violated CDP's credit card processing merchant services agreement.

---

[14] Exhibit B, collectively, depicts both one such receipt signed as, "known by Ying," as well as photographs of Duan's credit card being used for this purpose, along with a completed purchase showing her card number as the payment used to complete the transaction. The card numbers, both on Duan's credit card itself, as well as the receipts included herein, have been redacted except for the last four digits of card or account numbers to protect their private information and in conformity with Federal Rule of Civil Procedure 5.2. Transactions for which account or payment information is less relevant than the names or addresses to which watches were shipped have been redacted in their entirety for the same reasons.

85.     Duan was also shipping three to four watches out-of-state at a time, thereby avoiding Illinois sales taxes for the buyers on each watch and violating a myriad of CDP and Rolex policies.[15]

86.     Included within the list of states to which Duan was shipping were multiple states restricted by CDP policies specifically to avoid violating state sales tax laws.[16]

87.     The states Duan shipped watches to includes, but is not limited to Nevada and Arizona, which was prohibited by CDP. As Exhibits B and C make clear, she also shipped to Wisconsin and Indiana without collecting sales taxes.[17] The sales tax policies were ostensibly in place to comply with the recent U.S. Supreme Court decision in *South Dakota vs. Wayfair*, 138 S. Ct. 2080 (U.S. 2018).

88.     The watches Duan was volume selling and fraudulently shipping were frequently gold model watches priced at between $25,000 and $40,000 per watch.

89.     Di Lorenzo also discovered that although the watches were allegedly being sold and sent to customers with different names, the watches were all sent to the redundant address or addresses.

90.     Di Lorenzo also discovered that Duan's credit card information was used to complete the sales on most or all of these fraudulent transaction slips.

91.     Di Lorenzo notified Hill of Duan's activities. Hill took no action.

Krajisnik observes and reports Duan's illegal behavior

92.     On or approximately December 5, 2018, Krajisnik and Duan "connected" as "friends" on Facebook.

---

[15] Exhibit C, collectively, shows several receipts and warranties demonstrating multiple watches being sold to the same individuals, Ying Gong and Phoebe Zhang, and shipped out of state, in volume, to the same addresses.

[16] See the list of states to which CDP permitted shipping as part of Ex. A, pg. 20; see the receipts contained within Exhibits B and C, respectively.

[17] The receipts depicted in Exhibits B and C, respectively, show no sales taxes collected on any of these purchases.

93.     Krajisnik and her co-whistleblowers openly observed that, despite CDP and Rolex's clear policies forbidding online advertising and sale of Rolex products, and in clear violation of the Distribution Agreement, Duan was openly posting Rolex products on her Facebook page for sale in foreign countries.

94.     Included in Duan's social media activities were posts she made on Facebook pages for jewelry "flippers."

95.     Enclosed as Exhibits D-I are partial conversations and/or social media posts discovered by the Plaintiff and her co-whistleblowers, which Duan left open and accessible to anyone present on company computers (translated from Mandarin):

Exhibit D.      Conversation with Cici Hsieh;

Duan – *"whoever name needs to be on the warranty card, I can do it"*

Cici Hsieh – *"If I need other types, can I ask you?"*

Exhibit E.      Social media posting by Cici Hsieh titled "a bag of cash for a bag of watches," with corresponding picture of a Rolex watch and warranty card from CDP inventory;

Exhibit F.      Conversation between Ming Feng and Duan;

Ming Feng – *"Understood let me think about it"*

Duan – *"If you need more pictures with detail, I can take them. I work for a foreign authorized Rolex authorized provider. The product comes from the shop with full membrane.*

Exhibit G.      Conversation between Duan, Daniel Tu and unknown third party;

Daniel – *"Can this watch be sent to LA? Can we avoid taxing?"*

Exhibit H.      Duan listing numerous Rolex products for sale on social media; and

Exhibit I.      Facebook Messenger conversation with Ming Feng listing she her location as Taiwan, confirming her to be an overseas buyer.

96.     Distressed by Duan's actions, and well aware of the no-online sales policies, Krajisnik reported this to Nelson.

97.     Duan eventually became very bold with pursuing online and illegal sales. Krajisnik, and her co-whistleblowers, respectively, all witnessed Duan using her Facebook account to promote Rolex products and sales. Duan left her Facebook account open on CDP computers on several different occasions.

98.     On another occasion, Nelson saw direct private Facebook messages between Duan, and someone named "Daniel Tu" open on a CDP computer.

99.     The messages showed that Tu sent Duan lists of watches that he wanted, for resale on the overseas grey market.

100.    Eventually, Tu came into the store on multiple occasions. He browsed products and did not make an in-store purchase.

101.    Nelson witnessed Tu bring Duan a gift at the store. On another occasion, Tu came to the store and simply asked, "Where's the Chinese girl?"

102.    Krajisnik also began witnessing Duan engage in more flagrant violations of company policy and illegal behavior. She, too, began witnessing Duan utilize her own credit card[18] during sales phone calls and to complete these telephone transactions. See Exhibit B.

103.    Exhibit J depicts several instances of Rolex transactions utilizing Duan's personal credit card[19] to sell repeatedly to the same overseas buyers over short periods of time.

CDP engaged in other fraudulent behavior

104.    In approximately January 2019, Nelson observed Duan come to the store and package two boxes, ostensibly containing Rolex products. Upon investigation by Nelson, the boxes

---

[18] Not only should this have alerted CDP management to flagrantly illegal activity, but this was a clear violation of CDP and Rolex policies against employees purchasing Rolex products.
[19] Financial information other than the last four digits of Duan's credit card number have been redacted pursuant to Rule 5.2.

were addressed to another store employee, Haiwei Yuan, at his personal residence in Indiana.[20] Of particular note and concern, the box was shipped with Ralph Zupo's[21] name listed as the return contact for CDP.

105.    Upon information and belief, while Haiwei was employed by CDP, he was paid cash and not recorded on the official payroll of CDP.

106.    Rolex made a point of monitoring and limiting the amount of watches provided to its licensed retailers, including CDP. One of the ways that Rolex maintained high demand for limited supply watches was to require that they be special ordered, solely for known and existing customers.

107.    Beginning in February 2019, after the $10 million goal was announced, Hill ordered Krajisnik and her co-whistleblowers to place fraudulent "special" orders with Rolex in order to increase the CDP Rolex inventory available for unauthorized overseas sales by Duan, without the Plaintiff, Nelson, or Di Lorenzo having actual customers to purchase the merchandise.

108.    As Duan continued making unauthorized and illegal sales to fake purchasers, with Hill's knowledge and approval, more Rolex policies fell by the wayside. Eventually, Hill stopped meeting with Di Lorenzo to catalogue new watches. Rather, he began bringing them into and storing them in his locked office and either assigning them all directly to Duan, or giving others an unrealistically brief window to sell them before then assigning them to Duan, announcing that they had run out of time to find a buyer, and giving them to Duan to sell online. Duan would make a deposit using her own credit card to hold the watches for the online foreign buyers. All other salespeople were restricted from selling these watches.

---

[20] See Exhibit K, depicting a photograph of this box addressed to Yuan.
[21] The fired CDP Store Director who had not worked for the company for numerous years.

109.    In March 2019, Hill cut Krajisnik's hours in half, from 40 to 23 hours per week, and she stopped receiving Rolex products to sell. With no access to work shifts or products to sell, her sales suffered. At the same time, CDP increased her sales goals ensuring that she would be unable to meet her quota.

<u>Hill Attempts to Involve Di Lorenzo in the Scheme and Threatens Him for Refusing</u>

110.    Immediately after the $10 million sales goal was announced in early 2019 – Hill surreptitiously offered Di Lorenzo portions of several sales commissions on sales completed by Duan, in a transparent attempt to bribe a whistleblower and join the Scheme.

111.    Di Lorenzo refused the offer.

112.    Approximately one week later, Hill told Di Lorenzo that he and Baumgardner were going to fly Duan to Colorado to work on a side business. He stated that the side business would require "a lot of cash".

113.    A few days after Di Lorenzo's refusal of a share of the ill-gotten gains, Hill told Di Lorenzo, "Bob and I are not going to let no one derail our retirement plans."

114.    Hill would repeat the phrase, that he would "not let no one" derail his retirement plans" several times over the next several weeks.

<u>Nelson Engages in Protected Whistleblower Activity and is Illegally Fired in Retaliation</u>

115.    Nelson independently observed Duan's behavior independent of Krajisnik's complaints and became suspicious as the behavior continued over a period of several months despite her repeated reports to Hill.

116. In reviewing the point of sale software utilized by CDP, The Edge, Nelson discovered multiple transactions in which Duan allegedly sold Rolexes to individuals named, Jesse Shan and Phoebe Zhang.[22] Those transactions were all completed via Duan's personal credit card.

117. In approximately the end of February 2019, a young couple, appearing to be in their mid-20's, came to the store. No one working in the store, save Duan, had ever seen them, they did not have appointments, and they were not existing CDP customers with a verifiable purchase history.

118. That evening, with no prior notice to security or Nelson, Duan brought the couple into a private room, and brought 5 – 7 Rolex watches, each valued at $20,000 or more, into the room with them to view, and shut the door.

119. Nelson reported Duan's actions, in real time, to Hill. She told him that Duan had taken seven watches into a room and was violating numerous Rolex and CDP store policies. Hill simply told Nelson to "explain" the watch values to Duan, so she would be "more careful" in the future. See Exhibit L.[23]

120. Nelson later uncovered that the couple's names were Jesse Shan and Phoebe Zhang.[24]

121. That evening, despite the existence of CDP policies prohibiting sales of Rolex products to unknown buyers and the sale of multiple watches to such individuals, Duan sold three rare watches to the couple. However, the buyers did not leave with their watches. Rather, Duan had

---

[22] See Exhibit J.
[23] Exhibit L depicts Nelson's text message to Hill, reporting Ying's behavior.
[24] Zhang is one of the buyers depicted repeatedly in Exhibits B, C, and J. Zhang, Shan, and a third buyer, "Yunyue," were all repeatedly sold and shipped watches at the same address. "Yunueye" was a third client name that Duan used to mask her volume sales to repeat "customers," but was not actually a third buyer.

the watches shipped to Las Vegas. Nelson, in performing her job duties, investigated the Las Vegas address that Duan used and determined that it was the address for a Walgreens.

122.     Nelson reported the incident, via text message, to Hill, as it transpired, who took no corrective action.

123.     Duan would eventually sell the same customers three or four more rare Rolex timepieces over the next month or so. Of the six or seven watches Duan sold to this couple, they were all shipped out of state, to avoid paying sales taxes, to the same Las Vegas address.

124.     Nelson later discussed the incident in-person with Hill, who she did not yet suspect of being in concert with Duan. She told Hill that Duan was "dishonest," that she was "flipping" watches, and described her actions in selling a barrage of watches to these unknown buyers and shipping them out-of-state to avoid sales taxes. Duan's conversation depicted in Exhibit F corroborates her intent to evade sales taxes.

125.     Hill's response was that the buyers were "influencers,"[25] and that it would be good for CDP to sell to them.

126.     Nelson voiced her objection to Hill over Duan flipping watches multiple times in March and April 2019.

127.     During that same time period, Krajisnik reported some of Duan's actions to Hill. Hill's response to Krajisnik was to tell her to "protect" Duan from Nelson and others when he was not present at the store.

128.     In April 2019, on a day off, Di Lorenzo received a call from CDP's watchmaker, Paul Nichols.

---

[25] People who work in an advertising capacity, typically making social media posts to large social media followings on platforms like Instagram to sell various products.

129. Nichols called to inform Di Lorenzo that Duan left her phone open and he had observed that she had received an automated text that was sent to confirm a $26,000 deposit from overseas.

Hill & CDP take steps to cover up their crimes

130. In approximately May or June 2019, CDP announced to staff that the company would be further restricting out-of-state shipping due to concerns related to state tax laws. Hill, obviously concerned because this would affect his ability to continue his scheme with Duan, told Di Lorenzo that he had done research and discovered that Portland, Oregon did not apply sales tax. He later told Di Lorenzo that he mentioned this fact to Baumgardner, who approved him and Duan shipping empty boxes there.

131. Subsequently, Duan began shipping empty boxes to Portland, furthering the fraud in which she and Hill were now clearly engaged. Duan began shipping empty boxes to the same Portland address, despite allegedly selling to different buyers each time. On information and belief these watch sales were on behalf of online and foreign buyers.

132. In approximately March or April 2019, Nelson reported concerns to CDP's Head Accountant, Vicky Hill.[26]

133. Nelson explicitly told Vicky the following: (1) that Duan was using her own credit card to flip watches, and likely committing some form of credit card fraud; (2) that Duan's credit card numbers were showing up over and over on different receipts to watches allegedly sold to legitimate buyers; (3) that Duan was signing receipts on behalf of clients who never visited the store, sometimes forging signatures and other times signing, "Known by Ying [Duan]"; and (4) that Vicky

---

[26] No relation to Dyol Hill.

needed to review, carefully, Duan's sales receipts. Nelson also told Vicky about how Duan was deliberately and consistently shipping watches to out-of-state addresses to bypass sales taxes.

134.    Vicky's told Nelson that she no longer had the time to review the accounting books, her primary job duty, as she had suddenly, and for no obvious reason, been relegated to a private backroom office, doing "special projects" for Hill.

135.    Prior to that new duty, Vicky's primary duties were checking and rechecking sales slips, sales receipts, and related paperwork. Now, she could no longer regularly perform those tasks.

136.    Vicky asked Nelson for the credit card numbers that she had mentioned. During the discussion, Ms. Nelson asked Vicky to whom she was loyal. Vicky said "Seymour [Holtzman]." Nelson ended by saying that what Duan and Hill were doing was not right.

137.    Hill undertook other measures to keep Nelson from uncovering the full scope of the Scheme.

138.    Hill was often out of town or otherwise away from the store. Prior to Duan's sudden influx of sales and autonomy, Hill regularly allowed Nelson to use his office and computer. Beginning around February 2019, Hill began locking his office and prohibiting Nelson from entering or using his computer.

Nelson Escalates her Whistleblowing Activity

139.    On approximately May 4, 2019, Hill and Baumgardner ordered Nelson into an unannounced meeting with the two of them. Hill began by telling Nelson, "You've had some angst."

140.    Nelson told Hill that she believed he was "in bed" with Duan. She said, specifically, in front of both men, that she believed Duan was flipping watches and that Hill was allowing it.

141.    Hill began shouting and the meeting quickly deteriorated.

142.     As Nelson exited the room with Baumgardner, Hill asked, "Flipping watches? Like Joe and the Serbians?[27]"

143.     Once they were in private, Nelson told Baumgardner, "Bob, I'm not sure what to do here. I have special orders to other clients, they're flipping watches."

144.     During that discussion, Nelson showed Baumgardner images she discovered when Duan left her social media accounts open on company computer screens for all to see. The posts showed Duan communicating with sales contacts overseas, openly marketing Rolex products.[28]

145.     She also informed Baumgardner about witnessing Duan repeatedly shipping watches after using her own credit card to complete sales transactions, that Duan was frequently assisting her friends or sales contacts in flipping these watches in Asia, hence the non-removal of stickers, and that she witnessed Duan enter the store with bags of cash, and place large quantities of cash in the sales register. She showed Baumgardner images of Duan entering with the bags of cash.

146.     During that conversation, she also showed Baumgardner Duan's sales report, reflecting how she was volume-selling to the same customers and shipping all of the watches out of state to bypass sales taxes.

147.     Among the documents shown to Baumgardner were conversations between Duan and her "buyers," wherein they discuss how she is going to get them difficult-to-obtain watches. In those conversations, Duan openly discusses discounting and otherwise altering watch prices in violation of Rolex policies.

---

[27] As Di Lorenzo would later learn, this was a racist remark, likely made because Di Lorenzo's wife is of Serbian descent and a reference to a past sale he made to a customer of Eastern European descent in approximately December 2018. Baumgardner and CDP would later use that transaction – which was made lawfully, and in accordance with CDP and Rolex policies – as a flimsy and racist pretext to fire Di Lorenzo for "flipping."

[28] See Exhibits D – G.

148.    At the conclusion of their meeting, Baumgardner told Nelson not to discuss any of this with anyone else and that he would investigate.

149.    Following the meeting, Nelson emailed Baumgardner additional evidence of Duan's actions. See Exhibit M.[29]

Ying & Hill Openly Complete Fraudulent Transactions in the Store

150.    In approximately early May 2019, a few weeks after Nelson's meeting with Hill and Baumgardner, Krajisnik and Nelson were standing near the front of the store when Duan's boyfriend entered.

151.    Duan met him near the front where he unwrapped a plastic bag and removed a lunchbox. Near the cash register, he opened the lunchbox and removed a large quantity of cash.

152.    Hill then appeared from his office, greeted Duan and her boyfriend warmly and expectantly and brought them into his office, where they began counting the cash, with the door open.

153.    Upon information and belief, in furtherance of their money laundering activities, Duan and Hill, failed to report many of these cash transaction to the IRS on Form 8300, as required.

154.    Later that same evening, as part of her job duties, Nelson counted the cash in the register. In investigating, she uncovered that the cash had been applied to a specific customer's sale as part of a partial cash/credit card transaction.

155.    This was not the only time Hill or Duan engaged in odd behavior with large sums of cash.

---

[29] Exhibit M depicts a portion of Nelson's email to Baumgardner, corroborating her protected whistleblowing activities.

156.    On another occasion, Hill came to the store and, for no obvious reason placed a large quantity of cash in the register.

<u>Hill & Baumgardner  conspire to silence Nelson</u>

157.    Following the May 4 meeting, Hill spent most of the next month working to further marginalize Nelson and making preparations to preemptively legitimize her imminent firing.

158.    Hill hired another employee, Erik Kiluk, and assigned him several of Di Lorenzo and Nelson's most important job duties. Now, only Kiluk was allowed to close the cash register each night. Thereby precluding Di Lorenzo and Nelson from continuing to observe the Defendants illegal activity.

159.    Based on information and belief, Kiluk's new job duties also included doctoring Duan's many fraudulent receipts.

160.    Nelson, an assistant manager, and Di Lorenzo, the Rolex Manager, were no longer permitted to see the Rolex inventory.

161.    The Rolex boxes were locked in Hill and Kiluk's offices. Soon Mr. Di Lorenzo was no longer included on the emails discussing their Rolex inventory. They hired new sales staff, all while cutting Ms. Krajisnik's hours and barring her from access to selling Rolex products.

162.    Krajisnik, Nelson, and Di Lorenzo continued suffering in other ways due to their refusal to keep quiet about Duan and Hill's transgressions, and because they refused to participate in the Scheme.

163.    During this period Hill continued ordering them to make fraudulent "special" Rolex orders.

164.    On one occasion, three Rolex Green Submariner watches came to the store. On this occasion, Krajisnik had a buyer for the watch and requested that Hill give her access to one so she could sell it. Instead, Hill yelled at her, "You have not made any 'special' orders." Hill told her that the watches were *all* for Duan and simply told Krajisnik to make fraudulent watch orders if she wanted to sell any Rolexes.

165.    In late May or early June, CDP Human Resource Employee Caroline Di Batista contacted Krajisnik and said she was investigating allegations that Nelson had sexually harassed Duan by showing her social media photographs around the store inappropriately.

166.    Krajisnik told Di Batista that she was unaware of Nelson doing anything inappropriate.

167.    Krajisnik did, however, tell Di Batista of Duan's illegal activity. Di Batista responded that she was not investigating that issue and refused to discuss it.

168.    On June 19, 2019, Hill and Baumgardner initiated their plan to silence Nelson and warn any other would-be whistleblowers not to come forward. After completing the sham human resources investigation designed to corroborate their desired findings, CDP fired Nelson under a false pretext of her sexually harassing Duan, insubordination towards Hill, and "making false statements." The alleged primary pretext for her termination was the statement she made in the course of her protected activity of reporting illegal behavior, that "Doyle [Hill] was in bed with Ying [Duan]." Nelson was told that "in bed" was construed to have sexual connotations, when clearly Nelson was using the colloquial term for collusion.

169.    Her firing document contained a barrage of other falsehoods, accusing her, in part, of making false accusations of Duan of shipping empty watch boxes, even though the firing letter

itself included acknowledgements by Duan that she had shipped empty boxes.[30] The same letter also acknowledged that such conduct would be illegal.

170.    Indeed, the document Hill provided Nelson included that Duan had attempted to ship an empty Rolex box, which Hill claimed he personally caught and stopped, in December 2018. The document also included that he advised Duan that, "shipping an empty box was a terminable offense at CD Peacock," and, most importantly, that such behavior was "against the law and against company policy." It falsely claimed, however, that this was the only instance of such behavior.

171.    CDP illegally deducted $900 from Nelson's final paycheck.

172.    When CDP fired Nelson, they requested that Nelson return her company laptop, which she returned. They falsely accused her of breaking the computer and deducted $900 from her final paycheck.

Holtzman ignores obvious evidence of retaliation and the RICO conspiracy

173.    On July 21, 2019, after her firing, Nelson wrote to Holtzman and notified him of the Scheme. See Exhibit O.[31]

174.    In her email, she told him about Duan's credit card fraud, tax fraud, and about the violations of CDP and Rolex policies.

175.    Nelson's email also detailed Hill and Baumgardner's respective roles in the Scheme, and each's efforts to cover up the Scheme and silence her.

176.    Holtzman never responded.

---

[30] See Exhibit N, an excerpt from that termination letter.
[31] Exhibit O is the entirety of Nelson's email to Holtzman, which contained detailed photographic and other electronic evidence of Duan's illegal activity and management's complicity in her acts.

<u>CDP attempts to cover its tracks</u>

177.    After Nelson's firing, Baumgardner made a series of moves to create the appearance that the store was reaffirming its existing policies and that all of his, Hill, and Duan's recent actions were legal.

178.    Baumgardner reissued store policies as they related to Rolex. The policies reiterated all of the previously discussed requirements, with a particular emphasis on the requirement of in-store purchases.

179.    For the first time, Baumgardner also instituted a rule that all newly sold Rolexes must be sent to a specific engraver to ensure they were not sold improperly. This policy was seemingly issued for the benefit of all but Duan: her behaviors did not change, and only she was not required to send her sold watches to the engraver.

180.    Following Nelson's firing, Hill hired Mark Reinhardt, a former manager who had been previously been terminated by CDP.

181.    Hill also announced that moving forward, he and Reinhardt would be in charge of all Rolex shipments. Reinhardt would take any watches newly sold to the engraver.

182.    At around this time, Duan, in an effort to cover up the Scheme, began sharing partial sales commissions with other sales professionals (excluding the Plaintiffs), who had begun complaining about a lack of access to Rolexes.

183.    In July 2019, Kiluk allowed Krajisnik to sell a Rolex that she requested via special order for an actual customer.

32

184. After Krajisnik had successfully completed the sale, she witnessed Hill berate Kiluk for allowing her to sell the Rolex. She specifically overheard Hill ask Kiluk, "Why did you give those two watches to Suzana?"

185. When Kiluk replied that they had been assigned to her, Kiluk said, "Don't give Suzana Rolexes." Hill then yelled at Kiluk to come into his office.

186. Krajisnik's fears about her status at the company were later confirmed when Hill told Di Lorenzo that he, too, should not allow Krajisnik access to Rolex products and that he had specifically moved her sales goals such that she would be unable to meet them and be fired.

187. On approximately October 10, 2019, Krajisnik again reported Duan's actions, this time to Hill. She told him, after a company-wide meeting, that Duan was still listing products online in violation of policies. Hill's response, incredibly, was that he had "always encouraged posting watches online" and that this did not violate any of CDP or Rolex policies.

188. Just a few days after Hill's bizarre claims about posting watches online, Hill left CDP's employ under mysterious circumstances.

189. Hill told Di Lorenzo in a text message that he had been fired.

190. However, CDP employees were told Hill had resigned and moved home to Texas to be closer to his wife's family. Even after Hill's "firing" or pseudo-resignation, customers continued visiting the store to speak with Duan because "Dyol [Hill] sent them."

Di Lorenzo Uncovers Additional Fraudulent Activity by Duan Committed in Furtherance of the Scheme

191. Following Hill's departure, in the course of performing his duties as the Rolex Manager, Di Lorenzo discovered several Rolex warranties filled out by Duan that contained patently

33

and obviously false names of the watch buyers. The watch buyers' "names" included "Lebron James,"[32] "Richard Mille. "[33]

192.    Duan's behavior, by this point, was quite open. Exhibit B, referenced earlier, depicts Duan's credit card, left in plain sight, and a receipt containing her card number still open in front of her credit card on a computer screen, showing a blatant instance of her fraudulent behavior and lack of concern for being caught.

193.    Di Lorenzo informed new Store Manager Reinhardt of Duan's fraudulent activity. Reinhardt's answer was: "Ok, I'll bring it up to Bob and take care of it." Duan still faced no repercussions.

194.    At around this time, Reinhardt made further efforts to marginalize Krajisnik, ordering her to spend her time organizing inventory and cleaning items specifically to keep her out of the Rolex room and away from Duan and her illegal activities.

<u>Krajisnik is fired for whistleblowing under a false pretext of poor sales numbers</u>

195.    In approximately October 2019, CDP hired Chris Croteau to formally replace Hill as Store Director. Both Di Lorenzo and Krajisnik immediately experienced hostile behavior from Croteau, who would avoid making eye contact with or speaking to either unless absolutely necessary.

196.    On November 29, 2019, about 3 weeks before her firing, Krajisnik met with Croteau. She asked him if he had something against her. During the meeting, she also engaged in protected whistleblowing activity. She reported everything she knew about Duan's actions: the social

---

[32] See the top right-hand corner of page 4 of Exhibit C, showing "Lebron James" written on a warranty card. To the best of Plaintiff's knowledge, Mr. James was not a customer of CDP and had not purchased the watch in question.
[33] Richard Mille is the name of a noted watch brand. This sale was a split commission with Reinhardt himself, who must have known about the fraudulent behavior and profited from it.

media postings she had seen open on company computers, the violations of CDP and Rolex policy, the fraudulent use of credit cards, and the tax avoidant shipping. At one point, she said, "I think they are doing money laundering and tax evasion." She even bluntly told Croteau, "I think Duan is doing something illegal."

197. Croteau asked Krajisnik for proof. Ms. Krajisnik directed Croteau to the CDP computer network, explaining that much of the fraudulent information Duan entered should be readily accessible for all to review. She also told Croteau that Reinhardt and Hill were "in on" the scheme and profiting from Duan's actions, that she knew Hill was still involved as clients had continued visiting the store and said, "Dyol sent us."

198. Croteau told her, "Don't worry, be my eyes and ears about what's happening in store."

199. Krajisnik voiced fear over her sales, which had dipped through no fault of her own, but instead, as a result of a carefully orchestrated effort by the management to restrict her hours, deny her access to inventory, and clean and organize, rather than sell. Croteau told her, "Your job is not on the line, you're fine, I'll get you taken care of and get you training, and you'll be fine. I'm going to send you to Rolex training, you're going to be my $1,000,000 employee!"

200. During the meeting he also asked about Nelson, who he said he had heard had been fired for stealing. Lastly, Croteau ended the meeting by saying, "Don't tell Joe [Di Lorenzo] anything."

201. Just after this meeting, in December 2019, a shipment of popular Rolex watches arrived for a private sales event.

202.     As requested, Krajisnik succeeded in having several customers come to the event, but Croteau refused her access to the watches to sell, most of the clients eventually left as Defendants in furtherance of the scheme, did not allow her to sell merchandise to them.

203.     Upon Krajisnik requesting permission to sell watches to her customers at the event, Croteau first lied and tried to tell Krajisnik that the shipment had not arrived, but Krajisnik insisted she had seen the watch shipment.

204.     Croteau finally relented and gave her one GMT watch to sell, which she sold.[34] He refused, however, her requests to also sell a "Green Submariner" Rolex or a "Deep Sea" Rolex to a customer at the event, claiming, falsely, that these watched had been specially ordered by Duan.[35] Croteau's refusal to permitted her to sell the second watch, . Instead, Croteau gave those watch to Duan to sell after the event as part of the Scheme, and deliberately blocked Krajisnik from selling them.

205.     Three weeks later, like Nelson, Krajisnik was fired. This time, CDP's pretext was that it was due to her lagging sales numbers, which were a result of CDP's illegal Scheme and deliberate efforts to marginalize and fire her for her whistleblowing reporting and refusals to participate in the illegal criminal enterprise.

Holtzman ignores a second report about the Scheme

206.     By the time of Krajisnik's firing, Holtzman had already received Nelson's whistleblowing email months earlier, and was on notice of the ongoing illegal conduct.

---

[34] Exhibit S depicts the receipts showing first the receipt reflecting the sale Krajisnik was allowed to make. The second page reflects one of the watches that was given to Duan *after* the event.
[35] This claim, too, is easily disproven as false. On CDP receipts, on the left-hand side below where the receipts read "Purchase," "special orders" will read "special order." On the second receipt, depicted as part of Exhibit S, no such designation is written on the receipt, proving Croteau lied about the watch in question being specially ordered by Duan.

207.    On December 28, 2019, after her firing, Krajisnik too, emailed Holtzman to report what had transpired. See Exhibit P.[36]

208.    In her email, Krajisnik informed Holtzman about how she had been fired as retaliation for reporting illegal activity and policy violations to Croteau.

209.    Krajisnik also informed Holtzman about how Duan was engaged in an ongoing practice of violating company policies, about how Duan was engaged in "tax evasion," and about how Baumgardner was also involved in the Scheme.

210.    Holtzman's response belies any notion that he was concerned about her allegations, surprised by the email, or cared about the criminal enterprise being openly conducted at CDP.

211.    Holtzman's response was as shocking as it was damning. Holtzman's only response was to "Reply All" and to state, "Bob [ Baumgardner,] Tom[Keevan, Senior Vice President of Merchandising] I don't know who this person is and find out who gave her my email address ?"

212.    Damning for Holtzman, his response cements that he was well aware of the conspiracy, now having been notified and given specific details of the Scheme by two separate employees making substantially similar allegations, and was too busy profiting from it to care about the consequences. At a bare minimum, Holtzman approved of the Scheme. At worst, he was its mastermind, now angry that someone had uncovered his own participation in the Scheme.

<u>Di Lorenzo suffers the same fate as Nelson and Krajisnik</u>

213.    In December 2018, Di Lorenzo made a sale of a Rolex to a customer of Eastern European descent. He had never met this person before, and never spoke again. Di Lorenzo's wife

---

[36] Exhibit P contains Krajisnik's email to Holtzman, and his flippant and dismissive response, demonstrating his full support for and complicity in the Scheme.

is also of Serbian origin. The customer applied for financing through a third-party finance company offered at the point of sale.

214.    Di Lorenzo followed CDP procedure in making the sale, requiring the customer to provide a copy of his driver's license, which was valid and unexpired, before completing the sale. Apparently, the license was to expire within a month or two of the sale. No policy or law prohibited Di Lorenzo from completing the sale because the license might expire soon after. Di Lorenzo executed the sale and did not think of it again.[37]

215.    In November 2019, Croteau and Vicky Hill brought Di Lorenzo into a meeting and accused Di Lorenzo of engaging in possibly fraudulent behavior in concert "with the Serbian truck driver."

216.    Apparently, CDP used the fact that the now nearly one-year-old sale was made to someone with a soon-to-be-expired driver's license as a pretext to "investigate" Di Lorenzo for flipping watches. They insinuated that he was involved with a criminal organization and committing fraud because the buyer's license would have expired soon after the sale was completed. Notably, no one had raised concerns about this sale until almost a year after it was completed. Furthermore, there was never a policy in place to check the proximity of the expiration of the identification to the date of sale, merely to check that the identification was current.

217.    In early December 2019, just after Krajisnik met with Croteau to engage in whistleblowing activity, Croteau ordered Di Lorenzo into a closed-door meeting. Croteau told him, "I know everything that's going on here. Seymour [Holtzman] sent me here to clean up." Surprised,

---

[37] Hill's remark to Nelson back in May 2019 was not communicated to Di Lorenzo until much later – likely after his firing. It is now apparent that Hill's comment, "Flipping watches? Like Joe and the Serbians" was a thinly veiled threat to trump up charges of "flipping" against Di Lorenzo as retribution for objecting to and/or reporting the illegal activity.

Di Lorenzo said, "Really? So, you know about the tax evasion, Duan using her credit card, and the money laundering?" Croteau said, "Yea, re the address [Duan] is shipping to: I know that area because my sister-in-law lives right around the corner." At one point, Di Lorenzo said, specifically, that he was "worried that something illegal was going on," related to Duan's the credit card uses and regular shipping of watches.

218.     Nothing improved after Di Lorenzo's December complaint. Duan's illegal activity continued, unabated, after Krajisnik's firing and into January 2020.

219.     On January 6, 2020, Di Batista, Croteau, and Assistant Manager Mark Reinhart arrived at the store. They terminated Di Lorenzo's employment.

220.     They blamed his firing on his having made sales being to Eastern European men with soon-to-expire driver's licenses. Gallingly, they claimed that Di Lorenzo was engaged in a kickback scheme with "European guys" that "exposed the company to fraud."

221.     They told him he was fired, though they would let him resign in exchange for a positive employment reference. Di Lorenzo refused, and refused to sign their paperwork. A few hours later, Croteau sent him a text message, stating he would give a good referral for a new job; Di Lorenzo did not respond.

222.     They fired Di Lorenzo even though they knew he was the only breadwinner for his family and that his wife had just given birth to a child a few months earlier, after years of struggling to become pregnant.

223.     They fired Di Lorenzo, like co-whistleblower Nelson and Plaintiff Krajisnik, because he refused to participate in the illegal racketeering scheme, refused to accept bribes to remain silent about the scheme, and continued to complain about or report the illegal conduct.

224.    To date, Krajisnik remains unemployed.

## RICO ALLEGATIONS

225.    Plaintiff reincorporates and realleges by references paragraphs 1 through 224 as though fully set forth herein.

226.    As detailed above in paragraphs 1 through 224, Defendants Holtzman, Baumgardner, Hill, Croteau, and Duan (the "RICO Defendants") conducted or participated in the conduct of an enterprise, CDP, through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

227.    Alternatively, the RICO Defendants, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise, SCJ, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The actions of the RICO Defendants as against Plaintiff, and as described above, were in furtherance of the RICO Defendants' conspiracy and in violation of 18 U.S.C. § 1962(d).

## THE ENTERPRISE

228.     CDP was and is the passive instrument of the Defendants' racketeering activity and constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), separate and distinct from the individual Defendants named herein.

229.    Starting in approximately November or December 2018s, and continuing, upon information and belief, to present day, the Defendants, as well as other persons known and unknown, being persons associated with CDP, which was and is engaged in, and the activities of which affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts set forth herein. This illegal racketeering activity includes, but is not limited to engaging in a coordinated pattern of illegally

fraudulent behavior, to sell Rolex merchandise improperly and illegally at a high volume in order to hit the $10 million sales goal while defrauding Rolex, various state taxing authorities and to the detriment of the Plaintiff.

230. Plaintiff seeks to prohibit the Defendants from utilizing the pattern of unlawful conduct in which they have continually engaged during the relevant time period.

231. The pattern of racketeering engaged in by the Defendants involved at least two separate but related acts of racketeering activity, carried out from approximately November or December 2018 through the present.

232. Plaintiff was directly injured by the RICO Defendants' acts of racketeering activity.

**PREDICATE ACTS & THE PATTERN OF RACKETEERING ACTIVITY**

233. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant). As set forth below, the Defendants engaged in conduct violating 18 U.S.C. §§ 1341, 1343, and 1513 to effectuate their unlawful scheme.

234. The Defendants' acts were not isolated, but rather formed a pattern of conduct through which the RICO Defendants used the enterprise, CDP, to defraud Rolex and state taxing authorities, for monetary gain, and to silence the Plaintiff and the whistleblowers from complaining about and exposing such illegal and fraudulent acts.

235. The pattern of the Defendants' illegal racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), and 18 U.S.C. §§ 1341, 1512, and 1513 are based on the following facts:

236. The Scheme involved fraudulently falsifying Rolex sales transactions in a conspiracy to defraud Rolex, and most significantly, violating a multitude of state and federal laws, including but

not limited to racketeering, money laundering, immigration fraud, credit card fraud, and sales and use tax evasion, in service of reaching this $10 million sales target and/or other nefarious purposes.

237.    The Scheme, set forth chronologically earlier, was complex, involved all of Duan, Hill, Baumgardner, and, later, Croteau, and occurred with Holtzman's knowledge and/or tacit or explicit approval as he repeatedly failed to act or investigate when given explicit notice by Nelson and Krajisnik, respectively.

238.    The Scheme involved Duan listing Rolex products on online on her various social media pages, including Facebook, Instagram, and WeChat.[38]

239.    Duan would sell the watches, many of which were rare products, to both unknown buyers and known buyers who she knew intended to violate CDP and Rolex policies and CDP's Distribution Agreement[39] by volume selling or "flipping" Rolex products.

240.    In support of this practice, Duan would intentionally fail to remove the Rolex product's protective sticker so it could be resold as "brand new."

241.    The fraudulent acts by Duan, include but are not limited to sales she purportedly made to "customers," using her own credit card, on the following dates:

> A.  On April 10, 2019, Duan "sold" a $49,670 watch to "Phoebe W." using her own credit card;
>
> B.  On April 11, 2019, Duan "sold" a $34,650 watch to "Phoebe W." using her own credit card;
>
> C.   On April 13, 2019, Duan "sold" a $34,650 watch to "Phoebe W." using her own credit card; and

---

[38] China's largest messaging app.
[39] See Exhibit Q, Section 3 *supra*.

42

D. On April 16, 2019, Duan "sold" a $14,050 watch to "Phoebe W." using her own credit card.

242. On each of the sales set forth in paragraph 243, Duan recorded the sales as to "Phoebe" in the Edge computer system used by CDP, even though the transactions were completed using her credit card.

243. Duan engaged in additional fraudulent credit card transactions, using a different personal credit card, on:

A. March 1, 2019 in a transaction for a $34,650 watch;

B. March 4, 2019 in a transaction for a $33,650 watch;

C. March 21, 2019 in a transaction for a $37,550 watch; and

D. April 11, 2019 in another transaction for $34,650.

244. Duan completed these transactions by using her own credit cards and, at times, large quantities of cash brought to CDP in literal sacks of money by her friends and buyers. Duan would doctor receipts, forge "buyers'" signatures, or write "known by Duan" on receipts in place of the customer's signature.

245. By forging signatures, misrepresenting who actually purchased the watches, and/or using her own credit card to complete transactions purportedly made by others, Duan committed fraud on an ongoing basis between November or December 2018 and the present, in addition to violation of the CDP credit card merchant services agreement.

246. Duan would then either fraudulently represent on CDP sales documents and paperwork that the buyer had purchased the watch in the store but wanted it shipped as a gift or sent to themselves. She would either ship an empty box to make it appear that the watch had been shipped or would ship the watches themselves. She would send several watches to the same addresses around the country, including in Las Vegas, Nevada and Portland, Oregon, among others.

These watches were all purportedly sold to different buyers yet were continually sent to the same addresses. Some of the addresses did not even exist (e.g. were abandoned warehouses or the like), others were the homes of some of her customers who would flip the watches.

247. By shipping and pretending to ship the watches, she allowed her buyers to evade state taxes on an ongoing basis.

248. In support of the Scheme, Hill ordered all of his sales staff to make fraudulent requests to Rolex for specific hard-to-acquire watches, falsely claiming that the requests were on behalf of specific customers.

249. Hill's actions in demanding CDP sales staff commit fraud, on his behalf, so Duan could continue fraudulently volume selling watches include several instances of such behavior. One example was the incident in approximately July 2019, in which Hill berated Krajisnik for selling two watches, "Black and Blue Bezel GMT Master" (a "Batman watch"), which she had ordered and procured lawfully, and berated Kiluk for allowing her to do her job and sell the watches, rather than giving them to Duan in furtherance of the Scheme.

250. In turn, Hill precluded all other sales staff from accessing and/or selling Rolex products to their actual existing customers. He barred Di Lorenzo, the store's Rolex Manager, from access to inventory, and precluded anyone but Duan from selling the Rolex products.

251. Hill also created unnecessary and bizarre tasks for Di Lorenzo, Krajisnik, and Nelson to keep them busy and away from Duan and the scheme.

252. Hill also removed job responsibilities from all of these individuals, as well as anyone else who might have objected or uncovered the scheme.

253. For example, in approximately May or June 2019, Hill hired Kiluk and stripped Di Lorenzo and Nelson of their job duties so they could not supervise and/or otherwise impede Duan's actions.

254.     It was part of the Defendants' racketeering scheme to offer the Plaintiff and her co-whistleblowers an opportunity to participate in the scheme, in an effort to further cover up their actions, and to punish them by interfering with their scheduled work hours, work duties, and to deny them access to Rolex sales.

255.     Hill similarly diverted head accountant Vicky Hill's efforts, so no one was supervising Duan's receipts and other paperwork.

256.     Upon information and belief, in return for their participation in this scheme, Hill and Baumgardner received both cash kickbacks from the overmarket value resale of the improperly sold Rolex products. The payments came from the volume flippers of Rolex products, who frequently brought large quantities of cash to CDP both to help complete various transactions and as cash kickback payments to Duan, Hill, and Baumgardner.

257.     Baumgardner ensured that he supported Hill's efforts and the pattern of illegality generally by shaping the narrative of events presented to Holtzman if/when he received direct complaints, performing sham investigations to concoct false justifications to fire would-be whistleblowers, and carrying out those firings, first Nelson, and later Plaintiff Krajisnik and co-whistleblower Di Lorenzo.

258.     On approximately May 4, 2019, before Baumgardner was able to fire Nelson, he ensured she would not further engage in whistleblowing by ordering her not to discuss her concerns or observations with anyone else.

259.     Hill also threatened Di Lorenzo against whistleblowing, when in approximately February or March 2019, when he warned Di Lorenzo that, "Bob and I are not going to let no one derail our retirement plans."

260.     It was part of the Defendants' racketeering scheme to threaten Nelson, Krajisnik, and Di Lorenzo against reporting their concerns elsewhere, and to otherwise interfere with Plaintiff

and her co-whistleblowers' lawful employment and livelihood by terminating their employment in retaliation for providing truthful information relating to the Defendants' fraudulent scheme to the DOL, in violation of 18 U.S.C. § 1513(e).

261.    Part of the Defendants' scheme was to conspire to interfere with Plaintiff and her co-whistleblowers' employment and livelihood by terminating their employment in retaliation for providing truthful information relating to the RICO Defendants' fraudulent scheme to the other managers and for refusing to participate in the scheme, in violation of 18 U.S.C. § 1513(f).

262.    Later, after Nelson had been fired, Baumgardner seemingly pretended to fire Hill and/or misrepresented that Hill had moved home to Texas to make it appear as though he had uncovered improper behavior and fired Hill as a result.

263.    Baumgardner subsequently hired Croteau, who almost immediately began participating in the scheme.

264.    Croteau met with both Krajisnik and Di Lorenzo in late 2019 under the guise of expressing concern over rumors of illegal behavior. In reality, the meeting was an effort to learn what information the two had, what sort of proof they could produce, and to determine their loyalties.

265.    Furthermore, in order to cover up their illegal activities, CDP management illegally terminated three conscientious employees, Nelson, Krajisnik, and Di Lorenzo, who complained, objected, and refused to participate or keep quiet.

266.    As they repeatedly engaged in protected activity, Plaintiff and her co-whistleblowers were fired in succession under transparently artificial and contrived pretenses.

## RICO VIOLATIONS

### 18 U.S.C. § 1962(c)

267. Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by...any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c).

268. As set forth above, the Defendants are employed by an enterprise, CDP, which engages in interstate and foreign commerce.

269. As set forth above, the Defendants, as employees of the enterprise, used their positions with CDP to conduct or participate, directly or indirectly, in the conduct of CDP's affairs through a pattern of racketeering activity.

270. As set forth herein, the RICO Defendants' pattern of racketeering activity is comprised of predicate acts including mail fraud, wire fraud, and retaliation.

271. As set forth above, the pattern of racketeering activity engaged-in by the Defendants was for the common purpose of engaging in credit card fraud, concealing and benefitting from fraudulently misrepresenting sales to defraud Rolex, as well as state taxpayers through that concealment, and to silence Plaintiffs from exposing that concealment.

### 18 U.S.C. § 1962(d)

272. Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section." 18 U.S.C. § 1962(d).

273. The Defendants' conspiracy to commit mail and wire fraud on a wide scale in order to volume sell watches, engage in credit card fraud, concealing and benefitting from fraudulently misrepresenting sales to defraud Rolex, as well as state taxpayers through that concealment, and to silence Plaintiffs from exposing that concealment, as described above, violates 18 U.S.C. § 1962(d).

274. Each Defendant agreed to participate, directly or indirectly, in the conduct of the affairs of CDP through a pattern of racketeering activity comprised of numerous acts of mail fraud, wire fraud, and retaliation, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

## COUNT I: VIOLATION OF RICO 18 U.S.C. § 1962(c)

275. Plaintiff reincorporates and realleges by references paragraphs 1 through 274 against the Defendants as though fully set forth herein.

276. Plaintiff bring Counts I against the Defendants for violation of RICO 18 U.S.C. § 1962(c).

277. As alleged with particularity above, the facts demonstrate that the Defendants willingly and knowingly conducted or participated, directly or directly, in the conduct of CDP's affairs through a pattern of racketeering activity.

278. As alleged with particularity above, as a direct and proximate result of the Defendants' aforementioned RICO conduct, Plaintiff's lawful employment and livelihood have been irreparably damaged.

279. As alleged with particularity above, the Defendants are jointly and severally liable to Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys' fees as provided by 18 U.S.C. § 1964.

280. To the extent permitted by law, Plaintiff is entitled to damages, plus court costs, and pre and post-judgment interest at the legally allowable limit.

## COUNT II: VIOLATION OF RICO 18 U.S.C. § 1962(d)

281. Plaintiff reincorporates and realllege by reference paragraphs 1 through 274 against the Defendants as though fully set forth herein.

282. Plaintiff brings Count II against the Defendants for violation of RICO 18 U.S.C. § 1962(d).

283.    As alleged with particularity above, the facts demonstrate that the Defendants conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of CDP through a pattern of racketeering activity.

284.    As alleged with particularity above, as a direct and proximate result of the Defendants' aforementioned RICO conduct, Plaintiff's lawful employment and livelihood have been irreparably damaged.

285.    As alleged with particularity above, the Defendants are jointly and severally liable to Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys' fees as provided by 18 U.S.C. § 1964.

286.    To the extent permitted by law, Plaintiff is entitled to damages, plus court costs, and pre and post-judgment interest at the legally allowable limit.

### PRAYER FOR RELIEF AS TO RICO COUNTS ONE AND TWO

WHEREFORE, Plaintiff respectfully requests that this Court grant her the following relief:

a.   Treble the amount of all wages and benefits Plaintiff would have received but for Defendants' unlawful conduct, including but not limited to back pay, front pay, and pre-judgment interest;

b.   Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the damage to her reputation, loss of career opportunities, humiliation, anguish and emotional distress caused by the Defendants' unlawful conduct;

c.   Treble and/or punitive damages as allowed by law;

d.   An award of reasonable attorneys' fees, costs and litigation expenses pursuant to 18 U.S.C. § 1964(c) and all other applicable statutes; and

e.   Such other relief as the Court may deem just or equitable.

## COUNT III: VIOLATION OF THE IWA 740 ILL. COMP. STAT. 174/20

287.     Plaintiff reincorporates and realleges by reference herein against the RICO Defendants paragraphs 1 – 274 above, as if fully set forth herein.

288.     Plaintiff brings Count III against CDP, Holtzman, individually, Baumgardner, individually, Hill, individually, and Croteau, individually, for violation of the IWA. 740  Ill. Comp. Stat. 174/1, *et seq*.

289.     Under the IWA an employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation. 740 Ill. Comp. Stat. 174/20.

290.     An employee may bring a civil action against an employer who violates the IWA. 740 Ill. Comp. Stat. 174/30.

291.     CDP, Holtzman, Baumgardner, and Hill were the Plaintiff's employers, and the Plaintiff was CDP, Holtzman, Baumgardner, and Hill's employee as those terms are defined under the IWA. 740 Ill. Comp. Stat. 174/5.

292.     The Plaintiff engaged in legally protected activity, to wit, refusing to commit and/or participate in several fraudulent and otherwise illegal activities, including but not limited to credit card fraud, mail fraud, and wire fraud, when they refused to accept partial commissions from Duan's illegal sales.

293.     Defendants CDP, Holtzman, Baumgardner, Hill, and Croteau terminated the Plaintiff's employment in retaliation for their refusals to participate in the Scheme, racketeering activity, and the other frauds enumerated herein, in violation of the IWA.

294.     As the direct result of Defendants CDP, Holtzman, Baumgardner, and Hill's actions in violating the IWA, Plaintiff has suffered the loss of income, benefits, and career opportunities, as well as humiliation and emotional distress.

## COUNT IV: COMMON LAW RETALIATORY DISCHARGE

295.     Plaintiff realleges and incorporates by reference herein against the Defendants paragraphs 1 – 274 above, as if fully set forth herein.

296.     Plaintiff brings Count IV against CDP, Holtzman, individually, Baumgardner, individually, and Hill, individually, for common law retaliatory discharge.

297.     Illinois law permits an employee to recover damages for retaliatory discharge from their former employer, if the former employer discharges the employee in retaliation for refusing to participate in activity or the employee complains to a government entity or internally, and the discharge contravenes a public policy.

298.     The Plaintiff engaged in legally protected activity when she complained, repeatedly, to various members of management about Duan's illegal behavior, as well as when she escalated those complaints.

299.     The Plaintiff engaged in legally protected activity when she refused to participate in the Scheme, which included several forms of illegal activity.

300.     Defendants CDP, Holtzman, Baumgardner, and Hill discharged the Plaintiff in retaliation for her protected acts, which contravenes public policy.

301.     As the direct result of the illegal termination of her employment, the Plaintiff suffered loss of income, benefits, and career opportunities, as well as humiliation and emotional distress.

WHEREFORE, Plaintiff Suzana Krajisnik respectfully requests that this Court enter an order granting judgment in their favor against Defendants C.D. Peacock, Inc., Seymour Holtzman, individually, Robert Baumgardner, individually, Dyol Hill, individually, Christopher Croteau, individually, and Yinxue Duan, individually, grant her the following relief:

A. Lost wages in the form of back pay, with statutory interest penalties pursuant to 740 Ill. Comp. Stat. 174/30;

B. Lost wages in the form of front pay;

C. Damages for emotional distress and humiliation;

D. Reasonable attorneys' fees; and

E. The costs of this action.

## JURY DEMAND

Plaintiff Suzana Krajisnik demands a trial by jury.

The Garfinkel Group, LLC                              Respectfully submitted,
6252 N. Lincoln Avenue, Suite 200
Chicago, IL 60659
Haskell Garfinkel (IARDC No. 6274971)        _/s/ Haskell Garfinkel_____
haskell@garfinkelgroup.com                           One of the Plaintiff's Attorneys
Max Barack (IARDC No. 6312302)
max@garfinkelgroup.com                               _/s/ Max Barack_____
(312) 736-7991                                              One of the Plaintiff's Attorneys